**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **FRANKLIN OWUSU-ANSAH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **NO.  l:09-CV-02664-TCB-WEJ** |
| | ) | |
| **THE COCA-COLA COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**DEFENDANT THE COCA-COLA COMPANY'S
STATEMENT OF MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant The Coca-Cola Company ("Coca-Cola" or the "Company"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, files this Statement of Material Facts in Support of its Motion for Summary Judgment.

**I.  <u>Plaintiff Franklin Owusu-Ansah</u>**

1.  Plaintiff is from the country of Ghana.  (Pl. Dep. at 21:23 – 22:3.)

2.  Plaintiff began working for Coca-Cola in 1999 as a Customer Service Representative I at the Dunwoody Call Center in Dunwoody, Georgia.  (<u>Id.</u> at 78:18 – 79:14.)

3.      Plaintiff was promoted to Customer Service Representative II in 2001. (Id. at 81:7 – 81:11.)

4.      In 2002, Plaintiff was promoted to Monitoring Specialist.  (Id. at 86:22 – 86:24.)

5.      In 2005, Plaintiff became a Quality Assurance Specialist, and remains in that role today.  (Id. at 87:2 – 87:7.)

6.      As a Quality Assurance Specialist, Plaintiff's job duties involve monitoring the performance of frontline call center associates and providing feedback as to whether those associates are meeting their established quality standards.  (First Am. Compl. ("FAC") ¶ 6; Pl. Dep. at 82:13 – 82:25, 85:25 – 86:17.)

7.      Since 2005, Plaintiff has been a teleworker, performing most of his job duties from home.  (FAC ¶ 6; Pl. Dep. at  80:2 – 80:17.)

## II.    Coca-Cola's Equal Opportunity Policy

8.      Coca-Cola maintains an Equal Opportunity Policy which prohibits, among other things, discrimination or harassment based on national origin.  (Pl. Dep. Ex. 3.)

9.      The Coca-Cola Equal Opportunity Policy provides that if an employee "feels that he / she has experienced or witnessed discrimination or harassment, the

employee should immediately notify his / her Manager or the Human Resources Representative."  (Id. at 2.)

10.    The Coca-Cola Equal Opportunity Policy is posted on the Company's intranet, to which Plaintiff has access, and displayed on posters at the Dunwoody Call Center, where Plaintiff works.  (Pl. Dep. at 70:11 – 71:11.)

11.    Plaintiff has known of the Coca-Cola Equal Opportunity Policy since he was hired in 1999.  (Id. at 70:5 – 70:7.)

## III.    Plaintiff's Allegations of Mistreatment

12.    Plaintiff claims that, in 2000, his then-manager, Darryl Stewart, told him that "he had heard from confidential sources that [Plaintiff] was saying that women were supposed to be slaves because in Africa women are slaves."  (Pl. Dep. at 224:18 – 224:21.)

13.    Mr. Stewart allegedly asked Plaintiff to sign a document regarding these allegations.  (Id. at 224:16 – 225:17.)

14.    Plaintiff denied stating that women were supposed to be slaves but agreed to sign the document.  (Id. at 224:24 – 225:8.)

15.    Plaintiff did not receive any discipline in connection with this incident.  (Id. at 225:18 – 225:20.)

16.     Plaintiff does not believe that Mr. Stewart's actions were discriminatory.  (Id. at 225:21 – 225:25, 226:11 – 226:14.)

17.     Plaintiff did not report this alleged incident to Human Resources.  (Id. at 226:24 – 227:1.)

18.     Plaintiff claims that, on another occasion in 2000, a co-worker named Sylvia Watson said to him, "You know, Frank and all these African men, they are polygamists and they treat women like slaves."  (Id. at 116:12 – 116:14.)

19.     Plaintiff asked Ms. Watson for an apology.  (Id. at 117:18 – 118:5.)

20.     Ms. Watson apologized to Plaintiff.  (Id. at 118:6 – 118:7.)

21.     Ms. Watson never made a statement like that to Plaintiff again.  (Id. at 118:8 – 118:10.)

22.     Plaintiff did not report Ms. Watson's alleged comment to anyone.  (Id. at 117:14 – 117:15.)

23.     Plaintiff claims that, on at least one occasion between 2000 and 2002, his then-manager, Carmen Rodriguez, asked him to take her lunch out of the refrigerator and warm it up for her.  (Id. at 131:11 – 131:17.)

24.     Plaintiff claims that on another occasion, Ms. Rodriguez said to him, "'Hey, Frank, get my car.  I have a flat tire somewhere in the front, in the back.

Take it to the QuikTrip across the street and fill up the tire.'" (Id. at 131:20 – 131:22.)

25.    Plaintiff did not report Ms. Rodriguez's alleged actions to Human Resources.  (Id. at 135:11 – 135:18.)

26.    Plaintiff claims that, in 2003, Ms. Rodriguez approached him on the day before he was scheduled to take his vacation and said, "'I know you're going on vacation, but I just want you to know, you make your choice between your MBA and your job.  If at the end of your vacation, your job is not done, you're terminated.'"[1]  (Id. at 139:1 – 139:11.)

27.    Plaintiff did not report Ms. Rodriguez's alleged statement to Human Resources.  (Id. at 143:24 – 144:1.)

28.    Plaintiff did, however, seek assistance from the Ombuds Office regarding Ms. Rodriguez's alleged statement.  (Id. at 144:1 – 144:7.)

29.    The Ombuds Office is a "confidential, independent, neutral and informal resource" for employees to obtain information or assistance concerning a variety of workplace issues.  (Id. at 72:1–23; Pl. Dep. Ex. 4 at 1 – 2.)

30.    The Ombuds Office "is not a channel to notify the Company of a workplace issue."  (Pl. Dep. Ex. 4 at 4) (emphasis in original).

---

[1] Plaintiff was enrolled in an MBA program at the time and planned to use his vacation time to attend classes.  (Pl. Dep. at 133:15 -133:18.)

31.     Plaintiff understands that information provided to the Ombuds Office is not shared with other Coca-Cola employees.  (Pl. Dep. at 73:3–13.)

32.     The Ombuds Office advised Plaintiff to take his vacation.  (Id. at 152:11 – 152:15)

33.     Plaintiff took his vacation as planned.  (Id. at 143:15 – 143:16.)

34.     Plaintiff was not terminated or disciplined in any way.  (Id. at 143:17 - 143:20.)

35.     Ms. Rodriguez was terminated in July 2003.  (Id. at 155:17 – 155:20.)

36.     Plaintiff claims that, in 2004, he asked a sales executive named Greg Sample if Mr. Sample would mentor him.  (Id. at 376:10 – 376:13.)

37.     Plaintiff claims that Mr. Sample responded by saying that "Africans don't have the acumen to do what [Plaintiff] wanted to do, so [Plaintiff] should go and sit in [his] corner and answer some phone calls and think about job security." (Id. at 376:14 – 376:17.)

38.     Plaintiff did not report Mr. Sample's alleged statement to Human Resources.  (Id. at 377:25 – 378:2.)

39.     Plaintiff claims that, in 2005, a co-worker named Xavier Holland claimed that he had been told by the management team that they were waiting for Plaintiff to make his first mistake so they could fire him.  (Id. at 183:19 – 183:24.)

6

40.    Mr. Holland did not identify which members of the management team allegedly wanted to fire Plaintiff or explain how he became aware of this alleged plot.  (Id. at 186:10 – 186:22.)

41.    Mr. Holland did not make any reference to Plaintiff's national origin. (Id. at 190:4 – 190:8.)

42.    Plaintiff reported Mr. Holland's alleged comment to his then-manager, Ginger Bissell, who called a meeting with Plaintiff and Mr. Holland.  (Id. at 187:13 – 187:25.)

43.    Mr. Holland denied making the comment, but apologized to Plaintiff for any misunderstanding.  (Id. at 188:5 – 188:14.)

44.    Plaintiff never had any further conflicts with Mr. Holland.  (Id. at 189:7 – 189:9.)

45.    Plaintiff claims that, in April 2006[2], his then-manager, Brenda Weathersby, told him, "'We can transfer you to [Coca-Cola Enterprises] so you can work on a foreign assignment for one year.  And after one year, we expect you to leave.  And if you don't leave, the company will make sure that whatever we

---

[2] Plaintiff's First Amended Complaint alleges that this conversation took place in April 2007.  (FAC ¶ 13.)  During his deposition, however, Plaintiff testified that this conversation occurred in April 2006.  (Pl. Dep. at 176:18 - 176:23, 452:25 - 453:6.)

need to do to get you to leave, we'll do that to make sure you leave the company.'"
(Id. at 177:17 – 178:5.)

46.     Plaintiff believes that Ms. Weathersby's alleged comments were motivated by his race, sex, and national origin.  (Id. at 178:12 – 179:4.)

47.     When asked to explain the basis for his belief, Plaintiff testified, "Well, I am Franklin.  I'm from Africa, so my national origin is African.  And I'm male, so my gender is male.  So if she's making a reference to me, then that's who I am."  (Id. at 179:5 – 179:11.)

48.     Plaintiff offered no other basis for his assertion that Ms. Weatherby's alleged comments were motivated by his race, sex or national origin.  (Id.)

49.     Plaintiff also claims that Ms. Weathersby was responsible for the denial of his vacation reimbursement for 2006.  (FAC ¶ 12; Pl. Dep. at 456:17 – 456:24.)

50.     Coca-Cola maintains a Vacation Reimbursement Policy that provides that employees who purchase vacation days that they are unable to use may be eligible for reimbursement of those unused days.  (Pl. Dep. Ex. 11; Pl. Dep. at 445:1 – 445:14.)

51.     To be eligible for reimbursement under Coca-Cola's Vacation Reimbursement Policy, employees are required to submit a Vacation

Reimbursement Request Form which "must include the signatures of both [the employee] and [the employee's] manager."  (Pl. Dep. Ex. 11 at 1.)

52.     Plaintiff's Vacation Reimbursement Request Form for 2006 includes his signature, but not the signature of his manager, Ms. Weathersby.  (Pl. Dep. Ex. 12.)

53.     Because Plaintiff did not submit a properly completed Vacation Reimbursement Request Form before the deadline, he was not reimbursed for his unused vacation days.  (Cabral Dep. Ex. 9.)

54.     Plaintiff admits that he does not know who makes the decision to approve or deny vacation reimbursement requests.  (Id. at 448:17 – 449:2.)

55.     Plaintiff claims that, in January 2007, he overheard a conversation between Pat Krasniewicz, Director of National Customer Support, and Judy Hardegree, an administrative assistant, during which Mr. Krasniewicz allegedly said, "'What is this boy still doing here?  Why has he not been fired yet?'"  (Id. at 168:3 – 168:5.)

56.     Plaintiff claims that Ms. Hardegree replied, "'The boy heard what you said, you know, and you should have never said that in the first place.'"  (Id. at 168:7 – 168:9.)

57.     Plaintiff believes that Mr. Krasniewicz and Ms. Hardegree were referring to him.  (Id. at 170:24 – 171:16.)

58.     Mr. Krasniewicz was not Plaintiff's supervisor at the time of this alleged incident.  (Id. at 175:10 – 175:12.)

59.     Plaintiff did not report Mr. Krasniewicz's alleged statement to Human Resources.  (Id. at 173:24 – 174:1.)

60.     Plaintiff does not recall Mr. Krasniewicz making any other statements pertaining to him.  (Id. at 474:21 – 474:24.)

61.     Plaintiff does not work with Mr. Krasniewicz.  (Id. at 474:16 – 474:17.)

62.     Plaintiff claims that, on another occasion in 2007, he overheard a conversation between Aaron Mayrant, a team manager, and Elbert Terry, Mr. Mayrant's supervisor, during which Mr. Mayrant allegedly said, "'Franklin's approaching nine years here.  How much longer are you guys waiting before you get rid of him?'"  (Id. at 156:17 – 157:4.)

63.     Plaintiff claims that Mr. Terry replied, "'Oh, don't worry, it's all been taken care of.'"  (Id. at 157:4 – 157:5.)

64.     Neither Mr. Mayrant nor Mr. Terry supervised Plaintiff at the time. (Id. at 159:23 – 159:24, 161:15 – 161:16.)

65.     Plaintiff claims that, in February 2007, a co-worker named Lisa Ford remarked, "'Who would train you around here?'" in response to Plaintiff's statement that he was attending a training session that day.  (<u>Id.</u> at 263:16 – 265:1.)

66.     Ms. Ford did not make any reference to Plaintiff's national origin. (<u>Id.</u> at 265:24 – 266:2.)

67.     Plaintiff does not know why Ms. Ford allegedly made this statement. (<u>Id.</u> at 266:11 – 266:15.)

68.     Plaintiff did not report Ms. Ford's alleged statement to anyone.  (<u>Id.</u> at 266:16 – 266:19.)

69.     Plaintiff claims that, on March 8, 2007, a co-worker named Matt Dunn informed him that some of his work was going to be taken away and given to another employee because McDonald's had decided not to renew its contract with The Coca-Cola Company.  (<u>Id.</u> at 260:5 – 260:15.)

70.     Plaintiff does not know why Mr. Dunn allegedly made this statement. (<u>Id.</u> at 262:13 – 263:6.)

71.     Plaintiff's work was never taken away from him.  (<u>Id.</u> at 260:21 – 260:23.)

72.     Plaintiff claims that, in June 2007, he overheard Ms. Bissell say to several co-workers, "'Oh, my God, I can't stand him.'"  (FAC ¶ 12; Pl. Dep. at 108:24 – 109:12.)

73.     Plaintiff has never heard Ms. Bissell make any derogatory remarks concerning his race or national origin.  (Pl. Dep. at 108:16 – 108:21.)

74.     Plaintiff claims that, in 2007, he received phone calls at his house from unknown telephone numbers.  (Id. at 268:13 – 269:10, 277:2 – 277:13.)

75.     When Plaintiff would answer the phone, nobody would say anything on the other end of the line.  (Id. at 268:25 – 269:2.)

76.     Plaintiff allegedly believes that these anonymous phone calls were placed by Coca-Cola employees in an attempt to harass him.  (Id. at 268:13 – 269:10, 277:2 – 277:13.)

77.     Plaintiff claims that, during July 2007, several different managers, including Wesley Lackey, Pam Cooper, Jimmy Mitchell, and Farrolyn Caver, harassed him by poking their heads around corners and watching him while he was conducting feedback sessions with call center associates.  (FAC ¶ 11; Pl. Dep. Vol. 3 at 13:1 – 46:15.)

78.     This alleged behavior, which Plaintiff refers to as "peek-a-boo," ceased after Plaintiff asked Mr. Lackey if he needed to speak with him.  (FAC ¶ 11; Pl. Dep. Vol. 3 at 19:13 – 19:25, 34:16 – 34:23.)

79.     Plaintiff did not report this alleged behavior to Human Resources. (Pl. Dep. Vol. 3 at 22:1 – 22:19, 36:10 – 36:18, 41:23 – 42:4, 47:19 – 48:4.)

80.     Plaintiff has not gone to Human Resources to complain about any alleged incidents of discrimination during the past seven years.  (Pl. Dep. at 463:24 – 464:4.)

## IV.   **Plaintiff Engages in Threatening Behavior During Meeting**

81.     On Friday, December 14, 2007, Plaintiff met with his then-manager, Tanika Cabral, for a monthly "one-on-one" meeting.  (Id. at 283:15 – 283:20.)

82.     Plaintiff prepared an agenda for the meeting on which he listed "a candid discussion about work environment" as one of the topics he wanted to discuss.  (Pl. Dep. Ex. 14; Pl. Dep. at 283:10 – 283:12.)

83.     During the meeting, Plaintiff told Ms. Cabral about several of the incidents of alleged mistreatment he claims to have experienced over the course of his career, including the denial of his vacation reimbursement request in December 2006 and the alleged comment by Mr. Krasniewicz in January 2007.  (FAC ¶ 24; Pl. Dep. at 285:1 – 286:1; Cabral Dep. at 95:2 – 95:17.)

84.   Plaintiff told Ms. Cabral that people were laughing at him.  (Cabral Dep. at 95:2 – 95:17.)

85.   According to Ms. Cabral, Plaintiff became extremely agitated, raised his voice, banged his hands on the table, and stated, "Someone is going to pay." (Cabral Dep. at 79:25 – 80:24, 96:1 – 96:11, 98:14 – 98:19, 99:23 – 100:2, 145:8 – 146:22.)

86.   Ms. Cabral was alarmed and frightened by Plaintiff's behavior and his statement that "someone was going to pay."  (Id. at 147:13 – 147:17, 148:5 – 149:6.)

87.   Ms. Cabral immediately reported her concerns to her manager, Cassandra Cliette, who, in turn, contacted Melissa Welsh, Senior Human Resources Manager.  (Id. at 119:7 – 119:14, 125:23 – 126:7.)

88.   Ms. Cabral told Ms. Welsh about Plaintiff's behavior during the December 14, 2007 meeting and his statement that someone was going to pay. (Welsh Dep. at 17:20 –18:6.)

89.   Ms. Welsh became concerned after hearing Ms. Cabral's description of Plaintiff's behavior "because it sounded as though a threat had been made against an employee, or employees of the company."  (Id. at 18:12 – 18:14.)

90.     Ms. Welsh contacted Leslie Davis, Security Manager, to apprise Ms. Davis of the situation and request her guidance.  (Id. at 18:22 – 19:18; Welsh Dep. Ex. 14.)

91.     Ms. Davis, in turn, contacted Marc McElhaney, Ph.D., a consulting psychologist who specializes in crisis management and threat assessment. (McElhaney Dep. at 22:22 – 23:15, 75:5 – 75:11.)

92.     Ms. Davis requested that Dr. McElhaney assess Plaintiff to determine whether he posed a risk of harm to himself or his co-workers.  (Davis Dep. at 51:16 – 52:24; McElhaney Dep. at 87:16 – 87:25; Welsh Dep. at 71:8 – 71:12, 95:13 – 95:24.)

93.     On December 19, 2007, Dr. McElhaney interviewed Plaintiff at the Dunwoody Call Center.  (Pl. Dep. at 293:21 – 294:3.)

94.     During the interview, Plaintiff described many of the same alleged incidents he had described to Ms. Cabral on December 14, 2007.  (Id. at 295:12 – 295:20; Pl. Dep. Ex. 43.)

95.     Based on Plaintiff's behavior and statements during the risk assessment interview, Dr. McElhaney concluded that Plaintiff was under significant emotional distress.  (McElhaney Dep. at 119:13 – 119:1; Pl. Dep. Ex. 19.)

96.     Dr. McElhaney "felt like there was a strong possibility that [Plaintiff] was delusional."  (Id. at 128:9 – 128:20.)

97.     Dr. McElhaney had "significant concerns about [Plaintiff's] emotional and psychological stability."  (Id. at 108:24 – 109:4.)

98.     Dr. McElhaney recommended to Ms. Welsh that Plaintiff be placed on paid leave to allow time for further review.  (Welsh Dep. at 41:19 – 42:5; Pl. Dep. Ex. 19 at 1.)

99.     In accordance with Dr. McElhaney's recommendation, Plaintiff was placed on paid leave effective December 19, 2007.  (Pl. Dep. at 298:25 – 299:6; Pl. Dep. Ex. 16.)

100.    Dr. McElhaney arranged for Plaintiff to be evaluated by Christopher Riddell, M.D., a psychiatrist, on January 14, 2008.  (Pl. Dep. at 303:20 – 303:22.)

101.    Dr. McElhaney sent a letter to Dr. Riddell on or about January 10, 2008, explaining the basis for his referral of Plaintiff.  (Riddell Dep. Ex. 83.)

102.    Dr. McElhaney's letter to Dr. Riddell states, "I have asked Franklin to see you on a voluntary basis, to address the issue of stress and to explore if there is any need for psychiatric treatment and/or continued leave on a short-term disability status.  I have asked him to release you to discuss with me any issues relevant to his ability to carry out his duties at work."  (Id. at 1.)

103.   Plaintiff attended the appointment with Dr. Riddell on January 14, 2008, but refused to answer any questions concerning his employment and refused to sign a release allowing Dr. Riddell to discuss the evaluation with Dr. McElhaney.  (Pl. Dep. at 307:5 – 308:25; Riddell Dep. 166:15 – 167:18; Riddell Dep. Ex. 87 at 6 – 7.)

104.   As a result of Plaintiff's refusal to cooperate, Dr. Riddell was unable to complete his evaluation.  (Riddell Dep. 166:15 – 167:18; Riddell Dep. Ex. 87 at 6 – 7.)

## V.   Plaintiff Undergoes Fitness-For-Duty Evaluation

105.   On January 22, 2008, Dr. McElhaney sent a letter to Ms. Welsh informing her of Plaintiff's refusal to cooperate with Dr. Riddell and expressing concern about Plaintiff's "apparent level of emotional distress and . . . ability to perceive events accurately."  (Pl. Dep. Ex. 19 at 1.)

106.   Dr. McElhaney's letter goes on to state:

> In my opinion, [Plaintiff's] concerns cannot be fully addressed without ruling out the possibility of a mental condition that influences these perceptions.  I am also concerned about the level of agitation that is associated with these perceptions, and their subsequent impact on his ability to carry out his duties and relate to other employees successfully.  **I therefore recommend that Mr. Owusu-Ansah undergo a psychiatric/psychological fitness-for-duty evaluation to rule out the possibility of a mental condition that could interfere with his ability to successfully and safely carry out his job duties.**

(<u>Id.</u> at 1 – 2.) (emphasis added).

107.   Based on Dr. McElhaney's recommendation, Ms. Welsh sent a letter

to Plaintiff on January 28, 2008, stating:

> Your actions have resulted in the Company requiring you to complete an evaluation to identify whether there are any issues that could represent a risk to the safety of others in the workplace.  In addition, full compliance with the terms outlined in this memo is a condition to your continued employment with the Company.  The terms include the following:
>
> • You will be required to comply with potential recommendations as required by the evaluation.
>
> • You will be required to release all information associated with the completion of this counseling.
>
> • Any retaliatory actions taken against any employee of the Company will result in immediate termination.

(Pl. Dep. Ex. 21.)

108.   Plaintiff read and understood the terms outlined in Ms. Welsh's

January 28, 2008 letter.  (Pl. Dep. at 319:7 – 319:12, 320:5 – 320:15.)

109.   On February 20, 2008, Plaintiff returned to Dr. Riddell for a second

visit.  (<u>Id.</u> at 321:8 – 321:20; Riddell Dep. Ex. 87 at 4 – 5.)

110.   Dr. Riddell recommended that Plaintiff undergo an MMPI before

being cleared to return to work.  (Riddell Dep. at 120:10 – 121:16; Riddell Dep.

Ex. 87 at 4.)

111.    Dr. McElhaney scheduled an appointment for Plaintiff to take the MMPI on March 11, 2008, at the office of psychologist Anthony Levitas, Psy.D. (Pl. Dep. at 331:20 – 331:22.)

112.    Plaintiff failed to keep the appointment with Dr. Levitas on March 11, 2008.  (Id. at 331:23 – 332:1.)

113.    Plaintiff claims that he did not go to the appointment with Dr. Levitas on March 11, 2008 because he "wasn't given a reason why [he] had to take that test."  (Id. at 331:23 – 332:1.)

114.    On March 14, 2008, Ms. Welsh sent a letter to Plaintiff advising him that he was not in compliance with the conditions outlined in her letter of January 28, 2008: "Specifically, to date you have not gone to the doctor to have the evaluation completed and have, in fact, been uncooperative with our many attempts to complete the process."  (Pl. Dep. Ex. 32.)

115.    Ms. Welsh's letter further states: "Because of your lack of cooperation with these terms, you have been placed on leave without pay, effective March 16, 2008.  If you do not comply with the evaluation process by April 1, 2008, we will consider you to have voluntarily resigned from your position and your employment will be terminated." (Id.)

116.   Plaintiff was placed on unpaid leave as of April 1, 2008.   (Pl. Dep. at 335:6 – 335:8.)

117.   Dr. McElhaney scheduled a second appointment for Plaintiff to take the MMPI on March 20, 2008.  (Id. at 337:17 – 338:1; Pl. Dep. Ex. 33.)

118.   Plaintiff took the MMPI as scheduled on March 20, 2008.  (Pl. Dep. at 338:2 – 338:6.)

119.   On April 8, 2008[3], Dr. Levitas sent a report of Plaintiff's MMPI test results to Dr. Riddell.  (Riddell Dep. Ex. 85.)

120.   The report states that Plaintiff's clinical profile "has marginal validity because [Plaintiff] attempted to place himself in an overly positive light by minimizing faults and denying psychological problems . . . .  He is unlikely to seek psychological treatment or to cooperate fully with treatment if it is implemented." (Id. at 6.)

121.   Notwithstanding these findings, the report concludes that Plaintiff's clinical profile is "within normal limits."  (Id.)

122.   After reviewing the report, Dr. Riddell sent a letter to Dr. McElhaney on April 9, 2008, stating that he had completed his evaluation, and that, in his opinion, Plaintiff was able to return to work.  (Riddell Dep. Ex. 89.)

---

[3] A handwritten note on the fax transmittal sheet incorrectly states that the report was sent on "3-8-08." The correct date is printed at the top of the document.

123.    Based on Dr. Riddell's findings, Dr. McElhaney communicated to Ms. Davis that he was releasing Plaintiff to return to work.  (Davis Dep. at 144:12 – 144:23.)

124.    Plaintiff returned to work on April 22, 2008.  (Pl. Dep. at 347:16 – 347:19; Pl. Dep. Ex. 37.)

## VI.    **Plaintiff Files Charge of Discrimination**

125.    On April 23, 2008, Plaintiff filed a Charge of Discrimination alleging that he was subjected to discrimination based on his "race, sex, national origin, and retaliation, in violation of Title VII."  (Pl. Dep. Ex. 41.)

126.    Plaintiff's Charge does not allege that he was subjected to disability discrimination or that Coca-Cola violated the ADA in any way.  (Id.)

127.    At the time Plaintiff filed his Charge, he completed an EEOC Intake Questionnaire.  (Pl. Prod.-0043-46.)

128.    Plaintiff's Intake Questionnaire does not allege that he was subjected to disability discrimination or that Coca-Cola violated the ADA in any way.  (Id.)

129.    On April 30, 2008, the EEOC issued a Notice of Charge of Discrimination indicating that Plaintiff's Charge was brought under Title VII. (EEOC FOIA 19 of 66.)

130.   The EEOC's Notice of Charge of Discrimination does not indicate that Plaintiff's Charge was brought under the ADA.  (Id.)

131.   On June 29, 2009, the EEOC issued a Dismissal and Notice of Rights stating that "the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  (FAC Ex. A.) [D.E. 79.]

132.   Plaintiff has no evidence that the reason he was sent for a psychiatric evaluation had anything to do with his national origin.  (Pl. Dep. at 458:24 – 459:6.)

133.   Plaintiff lost a total of approximately $3,000 as a result of being placed on unpaid leave from April 1, 2008, until April 22, 2008.  (Id. at 336:25 – 337:3.)

134.   Plaintiff remains employed by Coca-Cola.  (Id. at 347:20 – 347:22.)

This 27th day of October, 2010.

Respectfully submitted,

s/ Michael W. Johnston
Michael W. Johnston
Georgia Bar No. 396720
Scott B. Mario
Georgia Bar No. 558490
Bethany L. Schneider
Georgia Bar No. 940713

KING & SPALDING LLP
1180 Peachtree Street NE
Atlanta, Georgia  30309

(404) 572-4600
(404) 572-5138 (fax)
mjohnston@kslaw.com
smario@kslaw.com
bschneider@kslaw.com

Elizabeth Finn Johnson
Georgia Bar No. 393353

THE COCA-COLA COMPANY
One Coca-Cola Plaza
Atlanta, Georgia  30313
(404) 676-3736
(404) 676-7636 (fax)
eljohnson@na.ko.com

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **FRANKLIN OWUSU-ANSAH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **NO.  l:09-CV-02664-TCB-WEJ** |
| | ) | |
| **THE COCA-COLA COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of October, 2010, I electronically filed this **Defendant The Coca-Cola Company's Statement of Material Facts in Support of Motion for Summary Judgment** with the Clerk of the Court using the ECF system which will send notification of such filing to the attorney of record listed below:

> Sandra Jackson Sheppard
> Sheppard & Associates Law Office, P.C.
> 455 Park Avenue, S.E.
> Atlanta, Georgia 30312

s/ Scott B. Mario
Scott B. Mario
Georgia Bar No. 558490

KING & SPALDING LLP
1180 Peachtree St. NE
Atlanta, Georgia  30309
(404) 572-4600
smario@kslaw.com